## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BENNE SINGLETARY        )
                                 )
        Plaintiff,      )
                                 )
        v.             )      C.A. No. 06-315-JJF
                                 )
Cpl. WILLIAM GOSNELL and   )
C/O MICHAEL WAPLES       )
                                 )
        Defendants.     )

### DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants William Gosnell and Michael Waples, ("State Defendants") by and through

undersigned counsel, hereby respectfully move this Honorable Court pursuant to Fed. R.

Civ. P. 56(c), to enter judgment in their favor as to all claims on the following grounds:

### BACKROUND

1.      Plaintiff, Benne Singletary, is a sentenced inmate in the custody of the Delaware

Department of Correction. He is currently incarcerated at the Delaware Correctional

Center (DCC) in Smryna, Delaware.

2.      On or about January 15, 2006, while housed in the Sussex Correctional Institution

in Georgetown, Delaware, Benne Singletary sustained serious wounds as a result of a

fight with another inmate.  *See Singletary Deposition Testimony* pg. 28: 15-24; pg.29: 1-

24 attached as Exhibit "A".

3.      Specifically, on January 15, 2006, inmate Singletary walked through the gym

door with blood on his body and shirt. Officer James informed medical staff that the

inmate was coming in for treatment. Singletary entered the infirmary from the gym with

what appeared to be large cuts on his body. *See Incident Reports 12316 and 12320* attached as Exhibit "B". It was later determined that inmate Drummond used a homemade shank (razor melted in toothbrush) to cut Singletary during a fight in the gym. *See Gosnell Affidavit* attached as Exhibit "C".

4.      As a result, several officers conducted a shakedown of the gym and the recreation yard. Id. An inventory of the cells of Singletary and Drummond (assailant) was done, but initially no weapons were found. Id.

5.      As soon after medical examined and treated Singletary's wounds he claimed were caused by falling against a gate, Sgt. Bates and Corporal Gosnell escorted Singletary to ASDA pending the outcome of an investigation. *Incident Report 12318* attached as Exhibit "D".

6.      On or about May 12, 2006, Singletary began this civil rights action *in forma pauperis* under 42 U.S.C. § 1983, wherein he alleges that prison officials failed to protect him from an inmate's attack even with the knowledge that the same inmate attacked him the day prior.(D.I. 2).

7.      The procedural history in this action is contained in the docket report, and has been summarized in the Defendants' answer in opposition at D.I. 44. For the sake of judicial economy, Defendants will include the procedural history only to the extent it describes Singletary's Opening Brief in Support of his Motion for Summary Judgment filed on June 27, 2007. (D.I. 41). Thereafter, on July 9, 2007, Defendants filed a motion requesting an enlargement of thirty days in which to file an Answering Brief. (D.I. 42). On or about July 17, 2007, Defendants' motion was granted and Defendants responded in opposition submitting evidence disputing plaintiff's claims raised by his summary

judgment motion. (D.I.I. 43, 44). This Honorable Court concluded that Plaintiff, the

moving party, failed to meet his burden, and thus denied his motion. (D.I.45). However,

Defendants were given leave to file a renewed motion for summary judgment. (D.I. 46).

7.    Consistent with the record before the court and numerous items docketed,

Defendants, file this renewed motion for summary judgment urging this Honorable Court

to enter judgment as a matter of law in their favor and against Plaintiff.

### STANDARD OF REVIEW

8.    A court may grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the party is entitled to judgment

as a matter of law." FED.R. CIV.P. 56(C).Where the moving party produces an affidavit or

other sufficient evidence of facts sufficient to establish the existence of any element

essential to that party's case, and for which that party will bear the burden of proof at trial

and the burden shifts, then the non-moving party may not rest on its own pleadings, but

must provide evidence showing a genuine issue of material fact for trial. *Celotex Corp. v.

Catrett*, 477 U.S. 317 (1986). The moving party assumes the initial burden to identify

evidence that demonstrates the absence of a genuine issue of material fact. *Walters ex rel.

Walters v. General Motors, Corp.*, 209 F. Supp.2d 481, 484 (W.D.Pa 2002). Once the

moving party meets its burden, then the burden shifts to the non-moving party to

demonstrate material issues of fact. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

248 (1986). The non-moving party must set forth "specific facts showing that there is a

genuine issue for trial ⋯" or the factual record will be taken as presented by the moving

party and judgment will be entered against the non-movant. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The non-moving party may not rest upon mere denials of the facts identified by the moving party, nor upon the vague argument that the record contains facts sufficient to support its claims. *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1987). Moreover, the non-moving party may not obviously substitute the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Instead, the non-moving party must point out in the summary judgment record evidence that creates a genuine issue of material fact. See *Celotex Corp. v. Catrett*.

### SINGLETARY'S FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

9.      An inmate must first exhaust the administrative remedies available to him prior to filing a §1983 action pursuant to the Prison Litigation Reform Act of 1996, (PLRA) 42 U.S.C. §1997e (a), regardless of whether the relief he desires can be granted by the administrative process. *Nyhuis v. Reno*, 204 F. 3d 65, 67 (3d Cir. 2000) *See also Booth v. Churner*, 206 F. 3d 289, 295 (3d Cir. 2000). Congress amended 42 U.S.C. §1997e (a) in response to the heavy volume of frivolous prison litigation filed by inmates who often file claims that are untidy, repetitious and regurgitate legal language. *Nyhuis* at 73-74. These claims require the courts to expend significant judicial resources to review these claims. *Id.* It is with these considerations, along with the plain meaning of 42 U.S.C. §1997e (a), that the Court must dismiss an action filed by or on behalf of a prisoner who has failed to exhaust all available administrative remedies prior to filing a lawsuit. *Id.* at 78. The Third Circuit unequivocally ruled that the exhaustion of administrative remedies requirement of the PLRA applied to any and all claims brought by an inmate pursuant to 42 U.S.C. §1983, regardless of the relief sought. *Id.* at 70.

10.    Singletary's Complaint is clearly subject to §1997e (a) exhaustion of remedies requirement.  *Porter v. Nussle*, 534 U.S. 516 (2002).  Section 1997e (a) is applicable to all inmate claims except those challenging the fact of duration of confinement. Singletary admits that he was aware of the SCI grievance procedure but nevertheless failed to file one concerning the assault which is the basis of this Complaint.[1]  (Exh. "A" Depo. Pg. 58, 16-24; pg. 59, 1-4).  Singletary alleges that since he verbally communicated his complaint to the grievance officer, he complied with the grievance procedure.  There is no evidence to substantiate Singletary's claim that he ever spoke with the grievance officer whom he identifies as "lieutenant dude." Furthermore, verbal communication of a grievance to an officer does not fit the requirements of the SCI grievance policy; nor does it guarantee a satisfactory resolution.  The grievance officer, in any event would have told Singletary to file a grievance. Singletary's reason for not following through with filing a grievance was because "the grievance system doesn't provide for damages." (D.I. 2). As previously mentioned,  the administrative remedies requirement of the PLRA applies to any and all claims brought by an inmate pursuant to 42 U.S.C. §1983, regardless of the relief sought. *Nyhuis,*  204 F. 3d at 70. (3d Cir. 2000). Furthermore, a review of the few grievances filed by Singletary during his incarceration at SCI, none relate to his claim of failure to protect, or for that matter being threatened by Drummond or anyone else.  (*Affidavit of Earl Messick* attached hereto at Exh. "E" ¶5 ).

---

[1]     Q. (State Defendants' Attorney) – So you were familiar that there was a grievance procedure at SCI?
        A. (Singletary) – I knew there was a grievance procedure, but—
        Q. And that you could submit forms of your grievance?
        A. Yes. I felt as though I can speak to him (grievance officer) verbally, so I considered that as following the procedures.
        Q. So your verbal communication you thought was sufficient—
        A. Yes.
        Q. –as far as a grievance?
        A. Yes.

11.     Based on Singletary's non-compliance with the grievance procedure of which he admits he was fully aware,  Singletary has failed to exhaust his administrative remedies, and therefore, his Motion for Summary Judgment  must be dismissed pursuant to 42 U.S.C. §1997e (c)(2).

**Singletary's Eighth Amendment Failure to Protect Claim**

12.     The Eighth Amendment imposes "a duty on prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Jones v. Beard,* 145 Fed. Appx. 743 (3d Cir. 2005). (citing, *Hamilton v. Leavy,* 117 F. 3d 742, 746 (3d Cir. 1997). In order to establish a failure to protect claim, an inmate must demonstrate that: (1) he is incarcerated under conditions posing a substantial risk of serious harm (the objective element); and (2) prison officials acted with deliberate indifference, i.e., that prison officials knew of and disregarded an excessive risk to inmate health or safety (the subjective element)." *Id.* at 745. (citing *Farmer v. Brennan,* 511 U.S. 825, 833-34 (1994)). To be deliberately indifferent, a prison official must both know and disregard an excessive risk to inmate health or safety. *Id.* at 837. This standard is subjective, not objective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Beers-Capitol v. Whetzel,* 256 F.3d 120, 131 (3d Cir.2001).

13.     Singletary alleges that he was "exposed to a substantial risk of serious harm. Specifically, the Defendants failed to protect him from another inmate who thereafter cut Singletary across chest, back and forearm." (D.I. 41, ¶3). Singletary further alleges that the Defendants were aware of Drummond's history of institutional violence as well as the assault between Drummond and Singletary the day before; therefore, they knew or should

have known that Singletary was at substantial risk of being harmed. *Id.*  Singletary cannot support a failure to protect claim for several reasons.

14.    First, Singletary was not incarcerated under conditions that posed a substantial risk of serious harm.  Rather Singletary, by his own actions on January 14, 2006, the day before the stabbing, created a risk of harm by meeting to fight Drummond. (Exh. "A" Depo. pg. 39: 10-24, 41: 2-24).   Even if Drummond threatened Singletary on January 13, 2006, Singletary admits however that he did not tell prison officials of Drummond's alleged threats. In fact, Singletary only told one other inmate.[2] (Exh. "A" Depo. pg. 32: 7-23). On January 14, 2006, Singletary and two of his friends assaulted Drummond. *Affidavit of Earl Messick* attached hereto at Exh. "E" ¶3.  The next day, January 15, 2006, Singletary anticipated a revenge match with Drummond, "I assumed that Drummond probably wanted to fight again." (Exh. "A" Depo. Pg. 44: 18-24). Some of the other inmates expected a fight too as they chose not to go the gym on January 15, 2006, for fear of getting caught up in it. (Exh. "E", ¶4). Singletary however, had prepared himself for such an event. The inevitable occurred when Drummond using a homemade shank assaulted Singletary who later required medical treatment for his injuries. Thus, it was Singletary's actions that caused the risk of harm.

15.    Second, the Defendants did not know of and disregard an excessive risk to Singletary's safety. Neither Defendant was aware of the Singletary/Drummond relationship or any problems thereof; therefore, they had no way of knowing what had

---

[2]    (State Defendants' Attorney) Q. Let me back up. Did you tell anyone else?
      A.  No, ma'am. I didn't tell anybody else.
      Q. At that point what did you think that Drummond was going to do or try to do?
      A. I knew I had to fight Drummond.
      Q. You what?
      A. I knew I had to fight Drummond or he was going to keep coming at me.

transpired between them earlier or ever. *See Affidavit of Waples* attached as Exhibits "F",

¶6). Nor did Singletary ever tell any officer that he felt threatened by Drummond. *Id.* In

fact, the record is devoid of evidence establishing that Singletary articulated specific

threats of serious harm, or that he made any complaints about Drummond to prison

officials. (Exh. "A"). Threats between inmates are common and do not, in every

circumstance "serve to impute actual knowledge of a substantial risk of harm." *Jones,*

145 Fed. Appx. at 745. (citing, *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir.1998).

Although Singletary cites to Drummond's alleged violent behavior, a review of

Drummond's Incident Reports from January, 2004 through January, 2006, found no

incidents of violent behavior. (Exh. "E", ¶ 5). Moreover, when questioned about the

circumstances of his injuries, Singletary told Waples that "a weight had dropped on him,"

(Exh. "F", ¶ 4); while Gosnell was told that Singletary "fell against the gate." (Exh."C",

¶3). Neither Defendant believed these responses as Singletary's injuries were consistent

with being cut by a sharp object. Singletary wasn't truthful about the circumstances of

his injuries nor would he say who assaulted him for fear of being called a "snitch." (Exh

"A", 42:12-17).

15.    Singletary failed to provide prison officials any information about the earlier

assault on Drummond, and he made untruthful statements about Drummond's assault on

him; therefore, Defendants did not have actual knowledge of the hostility between the

two inmates. The results of Earl Messick's investigation confirmed that Singletary's

assault on Drummond on January 14, 2006, was the direct cause of Drummond's assault

on Singletary on January 15, 2006. (Exh. "E", ¶5). The facts of this case clearly reveal

that Defendants did not fail to protect Singletary since they had no actual knowledge that

Singletary faced an unreasonable or excessive risk. *Beers-Capitol,* at 256 F.3d at 131.

Summary judgment therefore, in the Defendants' favor as to this claim is appropriate.[3]

### DEFENDANTS HAD NO PERSONAL INVOLVEMENT IN ALLEGED DEPRIVATION

16.     Singletary fails to prove any personal involvement by the named Defendants.  In

actions brought pursuant to 42 U.S.C. § 1983, an individual cannot be held liable in the

absence of personal involvement or knowing acquiescence of the alleged deprivation.

*Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981) *cert. denied,* 458 U.S. 1121

(1982).  "[T]he officials misconduct cannot be merely a failure to act.  Such officials

must have played an affirmative role in the deprivation of the plaintiffs' rights, i.e., there

must be a causal link between the actions of the responsible officials named and the

challenged misconduct."  *Id.*  Without identifying how they participated in, personally

directed, or acquiesced in the events which he claims deprived him of constitutional

rights, these Defendants can not be held liable and dismissal is appropriate.  *Gay v.

Petsock*, 917 F.2d 768, 771 (3d Cir. 1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207

(3d Cir. 1988).

### DEFENDANTS ARE IMMUNE FROM LIABILITY FOR SINGLETARY'S CLAIMS.

17.     Singletary seeks to hold the Defendants liable in their official, as well as their

individual capacities.  These Defendants however, are immune from such claims. To the

extent that Singletary seeks to hold Defendants liable in their official capacities for the

alleged torts and/or constitutional violations, the Doctrine of Sovereign Immunity bars

such claims.  *See* Del. Const. Art. I., Sec 9; *Doe v. Cates*, 499 A.2d 1175 (Del. 1985).

---

[3] On November 27, 2007, this Honorable Court, when considering Singletary's contentions' raised in his motion for summary judgment (D.I. 41), and Gosnell and Waples opposition thereto (D.I. 44), concluded that Singletary failed to meet his burden to demonstrate that defendants knew of and consciously disregarded an excessive risk to his health and safety. (D.I. 45). Therefore, this Honorable Court denied Singletary's motion for summary judgment. (D.I. 46).

The Defendants in this case clearly acted without gross or wanton negligence. Moreover their actions arose out of, and in connection with the performance of official discretionary duties. 10 *Del. C.* § 4001. Thus Defendants are immune from Singletary's tort and constitutional claims.

18.    Further, to the extent Singletary's Complaint names the Defendants in their official capacities, they are immune from liability under the Eleventh Amendment. The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment, however, only a clear indication of Congress's intent to waive the state's immunity will produce this result. *Id.* No such clear intent can be found in 42 U.S.C. § 1983. In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons. 42 U.S.C. § 1983.

19.    A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the Defendants in their official capacities are not "persons" for the purposes of 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, this Court lacks jurisdiction over the Defendants in their official capacities, and the Defendants are outside the class of persons subject to liability under 42 U.S.C. § 1983. Therefore summary judgment is appropriate.

> **DEFENDANTS WAPLES AND GOSNELL ARE IMMUNE FROM LIABILITY IN THEIR INDIVIDUAL CAPACITIES PURSUANT TO THE DOCTRINE OF QUALIFIED IMMUNITY.**

20.     Singletary also cannot maintain an action against the Defendants in their individual capacities pursuant to the doctrine of qualified immunity.  Government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Furthermore, the defendants are entitled to qualified immunity where they acted in good faith, without gross or wanton negligence, in the performance of their discretionary duties.  *Vick v. Haller*, 512 A.2d 249 (1986) (*aff'd in part and rev'd in part on procedural grounds*).

21.     In the case at bar, actions taken by Defendants were reasonable in light of their knowledge at the time. When Waples saw that Singletary was bleeding, he immediately sent him to medical for treatment. (Exh. "F", ¶4). In the infirmary, Gosnell attempted to get information from Singletary concerning the circumstances surrounding his injuries. Nevertheless, Singletary refused to provide any detail. (Exh. "C", ¶3).   Although the Defendants were acting after the fact, documents submitted with Defendants' response substantiate their claims that they had no prior knowledge of the Singletary/Drummond relationship. Given that Defendants are immune from liability in their official and individual capacities, Singletary cannot maintain this action and a Motion for Summary Judgment should be granted to the Defendants.

Wherefore, for the reasons stated herein, the Defendants respectfully request this Honorable Court to grant their Motion for Summary Judgment and enter judgment in their favor as a matter of law.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

  __/s/ Ophelia M. Waters
Ophelia M. Waters, ID#3879
Deputy Attorney General
Carvel State Bldg., 6th Fl.,
820 North French Street,
Wilmington, Delaware 19801
(302) 577-8400
Counsel for Defendants

Dated: December 31, 2007

### CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2007 I electronically filed *Defendants'*
*Renewed Motion for Summary Judgment* with the Clerk of Court using CM/ECF.  I
hereby certify that on December 31, 2007, I have mailed by United States Postal Service,
the document to the following non-registered participant: Benne Singletary, SBI
#332365; Delaware Correctional Center; 1181 Paddock Road; Smyrna, DE 19977.

/s/ Ophelia M. Waters
Ophelia M. Waters, I.D. # 3879
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400

# EXHIBIT A

# DEPOSITION PAGES 28 THRU 29

28

```
 1        Q.    In the gym?

 2        A.    Yes, ma'am.

 3        Q.    They have a weight room in the gym?

 4        A.    Yes.

 5        Q.    Any other activities you participated in?

 6        A.    No, ma'am.

 7        Q.    Now, you filed your lawsuit in January -- I'm

 8   sorry.  When did you file your lawsuit?  Do you remember?

 9        A.    No, ma'am.  I don't really know.  I ain't even

10   write that down.

11        Q.    I'm sorry?

12        A.    No, ma'am.  I didn't even write that down.

13        Q.    You are currently pro se, correct?

14        A.    Yes, ma'am.

15        Q.    You filed your lawsuit -- I'm looking for the

16   document.  When you filed your lawsuit you had filed, you

17   said your constitutional 8th Amendment rights had been

18   violated.  Is that correct?

19        A.    Yes.

20        Q.    I want to take you to the incident that you

21   describe in your complaint.  Can you tell me when the

22   incident occurred?

23        A.    January 13.  That's the first incident.

24        Q.    January 13?
```



WILCOX & FETZER LTD.
Registered Professional Reporters

29

1    A.    Yes.

2    Q.    What happened on January 13th -- what year?  I'm

3  sorry.

4    A.    2006.

5    Q.    Last year?

6    A.    Yes, ma'am.  I had beef with Antonio Drummond.

7  Antonio Drummond, he bullying people.  He was bullying a

8  lot of white boys, taking their commissary, and he wanted

9  to try me.

10    Q.    When you say you had beef with Antonio

11  Drummond --

12    A.    Meaning like me and him argued.

13    Q.    Disagreements?

14    A.    Yes.

15    Q.    Altercations?

16    A.    Yes.

17    Q.    Okay.  Antonio Drummond, is that who you said?

18    A.    Yes.

19    Q.    Who is Antonio Drummond?

20    A.    He's the one that stabbed me.

21    Q.    Is he an inmate?

22    A.    Yes, ma'am.

23    Q.    So you say you had beef with him and how long was

24  this going on, you and Antonio Drummond?

# DEPOSITION PAGE 32

Benne Singletary

32

1    hands on me, I'm not going to lay down.

2        Q.    Did you tell anybody what he was doing?

3        A.    That he was a bully?

4        Q.    Yeah.  Or what he was doing that he came up to

5    you, like you described to me, on January 12 he came up

6    to you and said some things?

7        A.    I got back on the chair.  I told this dude named

8    Buck, I told him, I said --

9        Q.    Is Buck an inmate?

10       A.    Yes.  I said, I don't -- this guy, they try to

11   hop on me in the gym, Drummond and the boy Shy.

12                   He was like, yeah, yeah, man.

13                   I said, them dudes is crazy.  He think I'm

14   some type of lame on or something.

15                   So on the 13th --

16       Q.    Let me back up.  Did you tell anybody else?

17       A.    No, ma'am.  I didn't tell anybody else.

18       Q.    At that point what did you think that Drummond

19   was going to do or try to do?

20       A.    I knew I had to fight Drummond.

21       Q.    You what?

22       A.    I knew I had to fight Drummond or he was going to

23   keep coming at me.

24       Q.    Why do you say that?



# DEPOSITION PAGE 39

1       A.      I don't recall how many inmates was there.

2       Q.      More than 10?

3       A.      Yes.

4       Q.      Give me a range, about?

5       A.      It had to at least -- it could be 35, 40 inmates.

6       Q.      Between 35 and 40 inmates in this location?

7       A.      Yes.

8       Q.      What were the inmates doing?

9       A.      They was either working out, standing around.

10      Q.      Okay.  This fight between you and Drummond, did

11  anybody else participate in this fight?

12      A.      At the time -- me and Drummond started fighting.

13  See, I was fighting Drummond.  He was dizzy.  He ended up

14  swinging and hitting somebody else.  So was anybody else

15  involved in the fight?  Yes, but when Drummond hit this

16  person and this person started hitting back, Drummond was

17  getting the best of him.  I came in again, intervened and

18  hit him again.  After that Drummond staggered to the

19  weight bar and grabbed 3, 4 pound weights, came back to

20  strike Smoke.  And Sonny came and struck Drummond.  After

21  that Drummond dropped the weights and Drummond walked

22  towards the door and stood there.  So where I was at, I

23  was just standing there to see what he was going to do

24  next.  I guess he was coming up with a story to go to

# DEPOSITION PAGE 41

41

1   Waples came into the main area of the gym?

2       A.   Officer Waples came out of his office when

3   Drummond pushed the buzzer.  The fight was over.

4       Q.   When you push the buzzer?

5       A.   When you push the buzzer that means you want to

6   go to medical.  Waples came out, he looked at Drummond.

7   He didn't say nothing.

8       Q.   Who?

9       A.   Waples.  He didn't say nothing.  He looked at him

10  and then Drummond went back out.  Drummond went to

11  medical.

12      Q.   What were you doing?

13      A.   I was just standing there.

14      Q.   Did you say anything?

15      A.   No, ma'am.

16      Q.   Did you draw the first punch?

17      A.   Yes.

18      Q.   Did you tell Waples that you just hit this guy

19  and that's why he's going to medical?

20      A.   No.

21      Q.   Did anybody else say anything?

22      A.   I'm sure a confidential informant told him what

23  happened.

24      Q.   So nobody came out right in the open and said

# DEPOSITION PAGE 44

Benne Singletary

44

```
 1      A.    We was fighting.  His face was messed up.

 2      Q.    Did you use anything?  What were you fighting

 3  with?

 4      A.    Just my hands.

 5      Q.    Your hands were wrapped?

 6      A.    Yes, ma'am.

 7      Q.    So the inmates are coming around talking to you,

 8  everybody is talking about this fight.  What else did you

 9  do that day?  Did you go through your normal routine?

10      A.    Yes.

11      Q.    Just chow and watching TV and pretty uneventful?

12      A.    Yes.

13      Q.    Okay.  You were going to say something?

14      A.    No.  I was listening to you.

15      Q.    So then we get to the 15th --

16      A.    14th.

17      Q.    I apologize.  The 14th.

18      A.    The 14th was like, I didn't know Drummond was,

19  whatever he was planning, but I assume that he probably

20  wanted to fight again.  I didn't know.  I went to gym.  I

21  did my usual, I walked to the back of the line.  I did

22  gym and somebody came up to me and said, they said

23  Drummond wants to run with you -- shoot the one.

24      Q.    That means he wants to fight you again?
```

# DEPOSITION PAGE 58 THRU 59

58

 1  grievances for me, and the lieutenant dude kept throwing

 2  them away.

 3      Q.    What were your grievances about?

 4      A.    It was about while I was there, I was wondering

 5  why am I sitting here.

 6      Q.    In ASDA?

 7      A.    Yes, ma'am.

 8      Q.    Any other complaints you had?

 9      A.    No.  I didn't grieve nothing else, because I had

10  the conversation to him.

11      Q.    I'm sorry?

12      A.    I didn't grieve nothing else, because I had a

13  conversation, we had a verbal conversation, so I didn't

14  grieve nothing else.  He was getting upset, because I

15  kept putting grievances in while I was there.

16      Q.    So you were familiar that there was a grievance

17  procedure at SCI?

18      A.    I knew there was a grievance procedure, but --

19      Q.    And that you could submit forms of your

20  grievance?

21      A.    Yes.  I felt as though I can speak to him

22  verbally.  I spoke to him verbally, so I considered that

23  as following the procedures.

24      Q.    So your verbal communication you thought was

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

59

```
 1   sufficient --

 2        A.   Yes.

 3        Q.   -- as far as a grievance?

 4        A.   Yes.

 5        Q.   After you were released from ASDA, did you have

 6   any more contact with Drummond?

 7        A.   No, ma'am.

 8        Q.   Have you had any contact with him since then?

 9        A.   They sent me and Drummond to -- in the hole.  In

10   the hole we didn't talk.  He was all the way at the end.

11   I was in front of him.  He was all the way at the end.

12        Q.   So you guys were separated from that point

13   forward?

14        A.   We were separated.  They moved me.  After that he

15   moved up here.

16        Q.   "Up here," what do you mean?

17        A.   Sussex County.

18        Q.   He moved?

19        A.   To Sussex County -- I mean Kent County.

20        Q.   DCC?

21        A.   Yes.

22        Q.   You were at Sussex, he was at DCC?

23        A.   Yes, ma'am.

24        Q.   And then?
```

# EXHIBIT B

DCC Delaware Correctional Center

SMYRNA DE, 19977

Phone#: 302-653-9261

## INCIDENT REPORT

| Group#: 2366 | Type: FYI | | | | |
|---|---|---|---|---|---|
| | | Incident Date: 01/15/2006 | Time: 09:45 | Confidential: No | |

Facility: SCI Sussex Correctional Institution

Incident Location: GYMNASIUM                                    Followup Required : No

Location Description: hallway between gym and medical

Violated Conditions:

Description of Incident:

at approximately 09:45 I c/o Henry,James heared the buzzer for the gym door, and hit the button for the gym door. Inmate Singletary,Benne walked through the door with blood on his body and shirt, which was removed.I then informed medical staff that they had an inmate coming in and hit the button for the medical door. Inmate Singletary then walked into medical. end of statement.

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| Benne, Singletary | No | N/A |

Evidence Type: N/A

Discovered By : N/A                                           Date Collected: N/A

                                                    Secured By: N/A

Type of Force Used  [ ]  PHYSICAL  [ ]  CHEMICAL [ ]  STUN  [ ]  OTHER  [ ]  CAPSTUN [X]  NONE

Restraints Used     : N/A

Immediate Action Taken:

N/A

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Inmate | Benne, Singletary | ▉▉▉▉▉ | N/A |
| Staff | James, Henry A | N/A | Correctional Officer |

Reporting Officer: Henry, James A (Correctional Officer)          Entered By: Henry, James A (Correctional Officer)

| Approval Information | | |
|---|---|---|

[X] Approved  [ ] Disapproved  Date: 01/16/2006  Approved by: Walker, Paul J III (Shift Commander - Large Inst.)

Comments: FYI

Page 1 of 1

12320

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone#: 302-653-9261

Date: 06/01/2007

## INCIDENT REPORT

**Group#:** 2366    **Type:** FYI

**Incident Date:** 01/15/2006    **Time:** 10:00    **Confidential:** No

**Facility:** SCI  Sussex Correctional Institution

**Incident Location:** MULTI-SECURITY    **Followup Required :** No

**Location Description:** Gym/Infirmary

**Violated Conditions:** 1.02/200.201 Assault

**Description of Incident:**

On the above date and approximate time Sgt. Bates in G.P. #3 received a phone call from G.P. 2 C/O Henry that a inmate just walked into medical from the gym with what appears to be large cuts on his body.  Sgt. Bates, Cpl. Gosnell and C/O M. Justice responded to medical  and observed inmate Benne Singletary _____ with large cuts on his body.  Sgt. Bates notified the Watch Commander Capt. Walker and immediately did a shakedown of the gym and yard.  Lt. Mears responded and interviewd inmate Singletary.  Sgt. Bates, Sgt. Harmon, Sgt. Nelson and Cpl. Gosnell did a shakedown and inventoried inmate Singletary and inmate Antonio Drummond cells.  At this time no weapon has been found.

| Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|
| N/A | N/A | N/A | |

**Evidence Type:** N/A

**Discovered By :** N/A    **Date Collected:** N/A

**Secured By:** N/A

**Type of Force Used** [ ]  PHYSICAL   [ ]  CHEMICAL [ ]   STUN  [ ]   OTHER   [ ]   CAPSTUN [X]   NONE

**Restraints Used**    : N/A

**Immediate Action Taken:**

Notified watch commander and immediately did a shakedown.

### Individuals Involved

| Person Code | Name | SBI# | Title |
|---|---|---|---|
| Inmate | Benne, Singletary | | N/A |
| Inmate | Antonio, Drummond A | _____ | N/A |
| Staff | Kevin, Bates | N/A | CO Corporal/Sgt. - Large Inst. |
| Staff | William, Gosnell R | N/A | CO Corporal/Sgt. - Large Inst. |
| Staff | Truman, Mears J | N/A | Staff Lt./Lt |
| Staff | Michael, Waples E Jr | N/A | Correctional Officer |
| Staff | James, Henry A | N/A | Correctional Officer |

**Reporting Officer:** Bates, Kevin  (Co Corporal/Sgt. - Large Inst.)    **Entered By:** Bates, Kevin (Co Corporal/Sgt. - Large Inst.)

### Approval Information

[✓] Approved   [ ] Disapproved   **Date:** 01/16/2006   **Approved by:** Walker, Paul J III (Shift Commander - Large Inst.)

**Comments:** FYI

**Page 1 of 1**

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BENNE SINGLETARY         )
                                 )

      Plaintiff,           )
                                 )

        v.               )      C.A. No. 06-315-JJF
                                 )

COL. WILLIAM GOSNELL and   )
C/O MICHAEL WAPLES        )
                                 )

      Defendants.       )

## AFFIDAVIT OF WILLIAM GOSNELL

I, William Gosnell having been duly sworn by law, do hereby depose and state as follows:

1.     I am employed by the State of Delaware Department of Correction ( "DOC") at the Sussex Correctional Institution (ASCI@) Georgetown, Delaware.  I have been employed by the DOC since November, 1995, starting at the Gander Hill facility. I transferred to SCI in April, 1998. I was promoted to Correctional Corporal in 2001. My duties include supervising and participating in the maintenance of discipline, order, security and housekeeping of assigned locations and/or staff. Additional responsibilities include supervising and participating in periodic shakedowns of buildings, grounds and cell blocks to detect contraband or defects in the security system.

2.     I make this affidavit based on my personal knowledge.

3.     On January 15, 2006, around 10:00 AM, I was assigned to Guard Post #3 when Sgt. Kevin Bates told me to go to the gym due to a disturbance.  When I arrived, C/O Michael Waples told me that one of the inmates, Benne Singletary, had gotten cut up pretty bad.  Pat searches were carried out for contraband on each individual exiting the

gym. Shortly thereafter, I went to the infirmary to check on Singletary's condition. I asked Singletary how he got his injuries and who was involved; he told me that he had fallen. Following his medical treatment, Sgt. Bates and I escorted Singletary to the holding cell. Once there, I again asked Singletary about the circumstances of his injuries to which he replied that he had fallen against the gate. He would not tell me the name of the inmate or inmates that may have been involved in the assault on him. I never stated to Singletary that I knew who attacked him as he alleges. When I was in the infirmary questioning him, I had just found out about the incident; therefore, there was no way that I could have known who had attacked him.

4.      Sgt. Bates and I discussed the situation with Captain Paul Walker, the Watch Commander at the time, who decided to administratively transfer Singletary to ASDA pending the outcome of an investigation. Officer M. Justice and I returned to Singletary's cell to inventory and pack his personal property. While inventorying his property, we found a note written by another inmate describing what had transpired between Singletary and Antonio Drummond ("Drummond") the inmate who assaulted Singletary. I confronted the inmate who wrote the note and he admitted that he had written it. The inmate then stated that he didn't think Drummond was going to cut Singletary, he thought they were just going to go "fist to fist and settle their problems with each other." It was evident from this inmate's responses to my questioning, that he either had prior knowledge of the assault or someone on the tier had told him about it.

5.      Upon learning this information, Drummond was pulled off the tier and transferred to pre-trial, behavior modification. Officer M. Justice and I did a razor check for the tier and found that Drummond did not have one, which led us to believe that

Drummond used his razor in the assault. The shank, a toothbrush with a razor melted into the handle, was later found and turned in as evidence.

6.    My incident report dated January 15, 2006, describes what I observed and heard following the assault on Singletary. Also, when Singletary and his gang assaulted Drummond two or three days before,  it was my day off; therefore, I had no knowledge of this earlier assault.  I only learned about the earlier assault because of Singletary's assault the next day.

7.    At no time did Singletary inform me that he wanted to be  moved to another area of the facility because he felt threatened by anyone.

_____
William Gosnell

SWORN TO AND SUBSCRIBED before me this _6th_ day of _August_ 2007.

_____
Notary

JUDITH ANN LEDERMAN
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires August 19, 2007

# EXHIBIT D

| Incident# | | | Date: |
|---|---|---|---|
| 12318 | | | 06/01/2007 |

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone#: 302-653-9261

# INCIDENT REPORT

| Group#: 2366 | Type: Inmate Involved | Incident Date: 01/15/2006 | Time: 10:00 | Confidential: Yes |
|---|---|---|---|---|

Facility: SCI Sussex Correctional Institution

Associated Disciplinary Report #(s) 5861                     Followup Required: No

Incident Location: MULTI-SECURITY

Location Description: Gym/Island I and II/Infirmary

Violated Conditions: 1.02/200.201 Assault
                     1.18/200.218 Possession of Dangerous Contraband

**Description of Incident:**

On the above date and approximate time I, Cpl W. R. Gosnell was told by Sgt K. Bates to go back into the gym because something was going on. C.O. Waples stated to me that one of the inmates got cut up pretty bad. We did pat searches on each individual departing the gym. I then went into the infirmary and found out that the individual that got cut up was Inmate Benne Singletary 00332365. I asked Inmate Singletary who did this to him and he stated that he fell. After being seen by medical staff Sgt Bates and I escorted Inmate Singletary to the holding cell. I again asked him who did it and he stated that he fell against the gate. Sgt Bates and I discussed the situation with Capt Paul Walker who was the Watch Commander at the time and it was decided to AT him to ASDA bending the outcome of the investigation. Officer M. Justice and I went down to Island I cell two to pack up and inventory Inmate Singletary's personal property. It was then that I found a note from Inmate ▇▇▇▇▇▇▇▇, Officer Justice and I went to ▇▇▇▇▇▇▇▇▇▇▇ and pulled ▇▇▇▇▇▇ off of the tier. Once off of the tier I describing what had happened between Inmate Singletary and Inmate Antonio Drummond showed him the note and asked him if it was from him? He stated yes, that it was from him. I then asked him why did Drummond cut up Singletary? ▇▇▇▇ stated to us (Gosnell, Bates, Justice) that he did not know that Drummond was going to cut up Singletary that he thought that they were just going to go fist to fist and settle their problems with each other. With this evidence Inmate Drummond was pulled off the tier and was transferred to Pre-Trial, Behavior Mod. Inmate Drummond was found without a razor after Officer Justice and I did a razor check for the tier. This is what led me to believe the Inmate Drummond was that individual who did the assault. That is why I asked Inmate ▇▇▇▇▇ the question that I did to prove my suspicions correct. I would also like to add that ▇▇▇▇ either had prior knowledge that the assault was going to happen and or someone on the tier told him what had happened. I know this to be true due to the fact that ▇▇▇▇▇▇ is on LOAP until ▇▇▇▇ and that he did not go to the gym this morning.

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| Benne, Singletary | No | Cutts And Lacerations |

Evidence Type: N/A                                                    Date Collected: N/A

Discovered By: N/A                          Secured By: N/A

Type of Force Used [ ]   PHYSICAL   [ ]   CHEMICAL [ ]   STUN [ ]   OTHER   [ ]   CAPSTUN [X]   NONE

Restraints Used   : N/A

**Immediate Action Taken:**

Notified watch commander and shooke down area. (Gym)

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Staff | William, Gosnell R | N/A | CO Corporal/Sgt. - Large Inst. |
| Witness | Michael, Justice D | N/A | Correctional Officer |
| Witness | Kevin, Bates | N/A | CO Corporal/Sgt. - Large Inst. |
| Inmate | ▇▇▇▇▇▇▇ | ▇▇▇▇▇▇▇ | N/A |
| Inmate | Antonio, Drummond A | ▇▇▇▇▇▇▇ | N/A |
| Victim | Benne, Singletary | 00332365 | N/A |

Reporting Officer: Gosnell, William R (Co Corporal/Sgt. - Large Inst.)     Entered By: Gosnell, William R (Co Corporal/Sgt. - Large Inst.)

**Page 1 of 2**

000001

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BENNE SINGLETARY )
)
Plaintiff, )
)
v. )    C.A. No. 06-315-JJF
)
COL. WILLIAM GOSNELL and )
C/O MICHAEL WAPLES )
)
Defendants. )

## AFFIDAVIT OF EARL MESSICK

I, Earl Messick having been duly sworn by law, do hereby depose and state as follows:

1.    I am employed by the State of Delaware, Department of Correction, at the Sussex Correctional Institution, (ASCI@) Georgetown, Delaware as Staff Lieutenant. I am the institutional investigator at this facility. I have held this position at all times relevant to the instant case.

2.    I make this affidavit based on my personal knowledge.

3.    On January 15, 2006, I commenced an investigation regarding an incident that occurred earlier that day in the gym area between inmates Benne Singletary ("Singletary") and Antonio Drummond. ("Drummond"). I learned almost immediately that the incident in question was provoked by an altercation that occurred between these same two inmates the day before. Testimony from inmate witnesses claimed that on January 14, 2006, Singletary, and two other inmates, James Broadnax and Dwayne Warren jumped Drummond in the gym and beat him up. These inmates agreed to give

statements only as confidential informants; they stated they would not testify in court.

Three of the inmates interviewed had provided useful information in prior investigations

that proved to be credible. Singletary, Broadnax and Warren were subsequently referred

to the inmate disciplinary board for violation of assault.

4.      Singletary originally told staff that the cuts on his body were the result

from injuries in a basketball game; however, it was evident his injuries were caused by a

sharp instrument. After being treated by medical staff, Singletary spoke with Lt. Truman

Mears and told him that Drummond charged into him while he was playing basketball

and assaulted him. Singletary then admitted that there had been an altercation between

him and Drummond the day before, and that he had expected Drummond to retaliate;

although, not with a shank. While investigating another incident on January 31, 2006, I

learned that some inmates had not gone to the gym on January 15, 2006, because they

were sure that Drummond was going to retaliate against Singletary and they did not want

to get caught up in it. Singletary later told me that he did not intend to tell who cut him

and indicated that he did not wish to pursue or participate in my investigation. He further

stated that he would not be willing to give testimony for use in court.

5.      The staff had no way of knowing that Drummond was preparing to attack

Singletary. If Singletary had gone to staff and told them that he had had an altercation

with Drummond and that he expected Drummond to exact revenge, preventive measures

would have been taken by the staff to avoid another assault. A review of Drummond's

Incident Reports from January, 2004, through January, 2006, found no reports of violent

behavior. It appears that Drummond's one violent episode was directly caused by

Singletary's assault. Among the few grievances filed by Singletary none of them relate

to being threatened by any one or having trouble with other inmates. The results of the investigation confirmed that the assault which took place on January 14, 2006, was the direct cause of the assault that occurred on January 15, 2006.


_s/Jf Earl T Messick_
———————————————
Earl Messick


SWORN TO AND SUBSCRIBED before me this 6th day of August, 2007.

_Phyllis Redden_
———————————————
Notary

PHYLLIS REDDEN
Notary Public, State of Delaware
My Commission Expires October 31, 2007

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BENNE SINGLETARY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-315-JJF |
| | ) | |
| COL. WILLIAM GOSNELL and | ) | |
| C/O MICHAEL WAPLES | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MICHAEL WAPLES

I, Michael Waples having been duly sworn by law, do hereby depose and state as follows:

1. I am employed by the State of Delaware Department of Correction ( "DOC") at the Sussex Correctional Institution (ASCI®) Georgetown, Delaware. I have been employed by the DOC for 21 years.

2. I make this affidavit based on my personal knowledge.

3. On January 15, 2006, I was in my office on duty in the SCI gym. The office window provides a clear view of the gym. At the end of the gym there's a door which opens up to a grassy/dirt yard where inmates can lift weights. The yard area is enclosed by a fence and overseen by a guard tower.

4. On this day there were very few people in the gym area. At one point, during the recreation period around 10:00 AM, the plaintiff, Benne Singletary ("Singletary") approached me covering his arm. I noticed that he was bleeding and asked him what had happened. He replied that a weight had dropped on him. I told him to go straight to medical for treatment.

5.    Later on medical called the gym and inquired how Singletary got cut. I could only tell them what Singletary had told me as I had witnessed no altercation in the gym area. Some officers and I checked the gym to find out where the altercation may have occurred; however, there was no trace of blood anywhere in the gym. The lack of blood in the gym area lead us to believe that the altercation occurred in the yard.

6.    Due to my work schedule, I was not aware of Singletary's assault on inmate Antonio Drummond which occurred the day before, on January 14, 2006. Lastly, Singletary never asked me to be placed in protective custody or indicated that he was threatened in any way.


_____
Michael Waples


SWORN TO AND SUBSCRIBED before me this __2nd__ day of __Aug.__, 2007.

_____
Notary

**HELEN M. JOHNSON**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
**MY COMMISSION EXP. 6-19-2010**